ORIGINAL
FILED

AUG 30 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1  ROBERT J. YORIO (SBN 93178)
   yorio@carrferrell.com
2  COLBY B. SPRINGER (SBN 214868)
   cspringer@carrferrell.com
3  CHRISTINE S. WATSON (SBN 218006)
   cwatson@carrferrell.com
4  CARR & FERRELL *LLP*
   2200 Geng Road
5  Palo Alto, California 94303
   Telephone: (650) 812-3400
6  Facsimile:  (650) 812-3444

7  Attorneys for Plaintiff
   ACTICON TECHNOLOGIES LLC

8

E-filing

9                  UNITED STATES DISTRICT COURT

10                NORTHERN DISTRICT OF CALIFORNIA

BZ

11  ACTICON TECHNOLOGIES LLC,                    CASE NO. 07   4507

12              Plaintiff,

13         v.                                    **COMPLAINT FOR PATENT
                                                 INFRINGEMENT; SUCCESSOR
14  PRETEC ELECTRONICS CORPORATION, a            LIABILITY; VICARIOUS LIABILITY;
    dissolved California corporation; PTI GLOBAL, ALTER EGO; FRAUDULENT
15  INC., a California corporation; CHIU FENG     TRANSFERS (CIVIL CODE SECTION
    CHEN, an individual; GORDON YU, an           3439, ET SEQ.); IMPROPER
16  individual; TOMMY HO, an individual;         DISSOLUTION; CONSPIRACY**
    ROBERT WU, an individual; GRACE YU, an
17  individual; KUEI LU, an individual; and DOES  **JURY TRIAL DEMANDED**
    1 through 20,
18
                Defendants.
19

20         Plaintiff ACTICON TECHNOLOGIES LLC, for its Complaint against Defendant PRETEC

21  ELECTRONICS CORPORATION, Defendant PTI GLOBAL, INC., Defendant CHIU FENG

22  CHEN, Defendant GORDON YU, Defendant TOMMY HO, Defendant ROBERT WU, Defendant

23  GRACE YU, Defendant KUEI LU and Defendants DOES 1 through 20, (collectively,

24  "DEFENDANTS") alleges as follows:

25                           **INTRODUCTION**

26         1.     This action is brought by ACTICON TECHNOLOGIES LLC (hereinafter

27  "ACTICON") against DEFENDANTS for damages arising out of Defendant PRETEC

28  ELECTRONICS CORPORATION's ("PRETEC"), and Defendant PTI GLOBAL, INC.'s

EXHIBIT   A

1   infringement of certain ACTICON patents and for DEFENDANTS' fraudulent transfer of corporate

2   assets in order to evade court process and avoid liability for such damages.

3          2.      As set forth in detail below, ACTICON is the owner of the entire right, title and

4   interest in U.S. Patent Nos. 4,603,320 (the "'320 Patent"); 4,543,450 (the "'450 Patent"); 4,972,470

5   (the "'470 Patent"); and 4,686,506 (the "'506 Patent") (collectively, the "Patents-in-Suit"), which

6   describe various forms of electronic connectors.  True and correct copies of the Patents-in-Suit are

7   attached hereto as Exhibits "A," "B," "C," and "D," respectively.

8          3.      PRETEC, prior to its dissolution on or about November 28, 2006, made, imported,

9   offered for sale, sold and/or distributed various electronic connectors that embody the technology

10  of the Patents-in-Suit.

11         4.      ACTICON is informed and believes, and thereon alleges, that Defendants CHIU

12  FENG CHEN, TOMMY HO, ROBERT WU, GORDON YU, GRACE YU, KUEI LU and DOES 1

13  through 20 were officers, directors and/or majority shareholders of PRETEC prior to PRETEC's

14  dissolution.

15         5.      Subsequent to PRETEC's dissolution on or about November 28, 2006, PRETEC

16  and/or DEFENDANTS continued to make, import, offer for sale, sell and/or distribute various

17  electronic connectors that embody the technology of the Patents-in-Suit as a manufacturer or

18  distributor operating as the business entities PTI GLOBAL, INC. and/or the unknown business

19  entities named as Defendants DOES 1 through 20.

20         6.      PRETEC and/or DEFENDANTS continued to make, import, offer for sale, sell

21  and/or distribute various electronic connectors that embody the technology of the Patents-in-Suit

22  despite the fact that PRETEC received notice of the complaint for Patent Infringement in *Acticon*

23  *Technologies LLC v. Pretec Electronics Corporation, et. al.*, United States District Court Case No.

24  C 06-4679 JF (HRL).

25                                      **<u>JURISDICTION</u>**

26         7.      The Court has jurisdiction and supplemental jurisdiction over this matter because it

27  is an infringement action arising under the United States Patent Act (35 U.S.C. § 271 *et seq.*).

28  Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. sections 1331 and 1338(a).

8.    ACTICON is informed and believes, and thereon alleges, that DEFENDANTS are subject to personal jurisdiction in this District, because Defendant PTI GLOBAL, INC. is located in this District and PRETEC ELECTRONICS CORPORATION was located in this District prior to its dissolution.  ACTICON is further informed and believes, and thereon alleges, that DEFENDANTS have caused tortious injury in this District by acts both inside and outside the District and regularly solicit business in this District or derive substantial revenue from sales of goods, including infringing goods in this District, or otherwise have engaged in a persistent course of conduct in this District.

## **VENUE**

9.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because PRETEC ELECTRONICS CORPORATION was headquartered in this District prior to its corporate dissolution and Defendant PTI GLOBAL, INC. is headquartered in this District.

## **INTRA-DISTRICT ASSIGNMENT**

10.    For the purposes of Civil L.R. 3-2(c) and (d), this Intellectual Property action may be assigned to any division of this District.

## **PARTIES**

11.    Plaintiff ACTICON is a limited liability company, which has its principal place of business in Suffern, New York.

12.    ACTICON is informed and believes, and thereon alleges, that Defendant PRETEC was a California corporation, which had its principal place of business at 46791 Fremont Boulevard, Fremont, California, until its dissolution on or about November 28, 2006.  Plaintiff is further informed and believes, and thereon alleges, that PRETEC designed, manufactured, marketed, distributed, imported, sold and/or offered for sale in the United States PCMCIA, CompactFlash and Secure Digital I/O form factor electronic connectors.

13.    The products referenced above in paragraph 12 (hereinafter, the "Accused

1  Products") employ an electronic connector that connects a computer and one or more external

2  devices, whereby such electronic connector converts signals between the computer and external

3  devices in order to obtain a desired connecting configuration and/or function.

4        14.    ACTICON is informed and believes, and thereon alleges, that Defendant CHIU

5  FENG CHEN was a Director of PRETEC.  Plaintiff is informed and believes, and thereon alleges,

6  that during the time that Defendant CHIU FENG CHEN worked in the capacity as a Director of

7  PRETEC, he either resided and/or did business in or around Fremont, California.

8        15.    ACTICON is informed and believes, and thereon alleges, that Defendant TOMMY

9  HO was an Operations Manager for PRETEC.  ACTICON is further informed and believes, and

10  thereon alleges, that Defendant TOMMY HO also was a Director and/or Officer of Pretec

11  Technology, Inc., which subsequently changed its corporate name to PTI GLOBAL, INC.  Plaintiff

12  is informed and believes, and thereon alleges, that during the time that Defendant TOMMY HO

13  worked in the capacity as an Operations Manager and/or Director of PRETEC and as an Officer

14  and/or Director of PTI GLOBAL, INC., he either resided and/or did business in or around Fremont,

15  California.

16        16.    ACTICON is informed and believes, and thereon alleges, that Defendant ROBERT

17  WU was an Operations Manager for PRETEC.  ACTICON is further informed and believes, and

18  thereon alleges, that Defendant ROBERT WU also was a Director and/or Officer of Pretec

19  Technology, Inc., which subsequently changed its corporate name to PTI GLOBAL, INC.  Plaintiff

20  is informed and believes, and thereon alleges, that during the time that Defendant ROBERT WU

21  worked in the capacity as an Operations Manager and/or Director of PRETEC and as an Officer

22  and/or Director of PTI GLOBAL, INC., he either resided and/or did business in or around Fremont,

23  California.

24        17.    ACTICON is informed and believes, and thereon alleges, that Defendant PTI

25  GLOBAL, INC. is a California corporation with its principal place of business located at 231

26  Whitney Place, Fremont, California.  ACTICON is further informed and believes, and thereon

27  alleges, that PTI GLOBAL, INC. was originally incorporated under the name Pretec Technology,

28  Inc.

18.    ACTICON is informed and believes, and thereon alleges, that Defendant PTI GLOBAL, INC. manufactures, uses, imports, distributes, offers for sale and/or sells PCMCIA, CompactFlash and Secure Digital I/O form factor electronic connectors under the PRETEC brand name.

19.    ACTICON is informed and believes, and thereon alleges, that Defendant GRACE YU was the President, Secretary, Chief Executive Officer and Chief Financial Officer of Pretec Technology, Inc., which subsequently changed its name to PTI GLOBAL, INC., until in or about November 2006.

20.    ACTICON is informed and believes, and thereon alleges, that Defendant KUEI LU has been the Chief Executive Officer, Secretary and Financial Officer of PTI GLOBAL, INC. since in or about November 2006.

21.    ACTICON is informed and believes, and thereon alleges, that DOES 1 through 20 were officers, directors and/or majority shareholders of PRETEC and/or are unknown business entities in the business of designing, manufacturing, marketing, distributing, importing, selling and/or offering for sale in the United States PCMCIA, CompactFlash and Secure Digital I/O form factor electronic connectors.

22.    Plaintiff is informed and believes, and thereon alleges, that during a period of time prior to 2006, Defendant GORDON YU was the President of PRETEC and that Defendant GORDON YU was an officer, director and/or majority shareholder of PRETEC.

23.    ACTICON is informed and believes, and thereon alleges, that at all times relevant hereto, each of the Defendants was the agent, affiliate or co-conspirator of the other defendants and in committing the acts hereinafter set forth, acted within the scope of such agency, affiliation or conspiracy and/or ratified or acquiesced in the acts of the other defendants.

24.    ACTICON is unaware of the true names or capacities of remaining Defendants Does 1 through 20, whether corporate, individual, partner, employee, agent, co-conspirator, or otherwise, and prays leave of court to allege said true names and capacities when the same have been ascertained.

25.    ACTICON is informed and believes, and thereon alleges, that in doing the things

1   herein alleged, the named defendants and Does 1 through 20, inclusive, were each the agent,

2   employee or servant of the remaining of said Defendants or that Defendants Does 1 through 20 are

3   in some other means or manner responsible for the acts and conduct hereinafter alleged.

4

5                                      **GENERAL ALLEGATIONS**

6          26.     ACTICON is informed and believes, and thereon alleges, that PRETEC was named

7   as a Defendant in the Complaint entitled *Acticon Technologies LLC v. Pretec Electronics Corp., et.*

8   *al.*, filed on August 1, 2006, in the United States District Court for the Northern District of

9   California, Case No. C 06-4679 JF (HRL) ("FIRST COMPLAINT").   ACTICON is informed and

10  believes, and thereon further alleges, that Defendant ROBERT WU (as corporate representative of

11  PRETEC) was personally served with the summons and FIRST COMPLAINT at 46791 Fremont

12  Boulevard, Fremont, California, on or about August 17, 2006.

13         27.     PRETEC did not respond to the FIRST COMPLAINT on or before September 6,

14  2006, the deadline for PRETEC to answer or otherwise respond to the FIRST COMPLAINT.

15         28.     On or about September 13, 2006, ACTICON filed a Request for Entry of Default

16  against PRETEC.  On or about September 15, 2006, ACTICON filed a Second Request for Entry of

17  Default against PRETEC.

18         29.     On September 19, 2006, the Clerk of the United States District Court, Northern

19  District of California entered the default of PRETEC in *Acticon Technologies LLC v. Pretec*

20  *Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL), as Docket Entry 13.

21         30.     On or about October 5, 2006, counsel for ACTICON sent a letter to PRETEC via

22  certified U.S. mail advising that ACTICON would request entry of default judgment against

23  PRETEC if PRETEC did not respond to ACTICON's communication on or before October 11,

24  2006.  PRETEC did not respond to ACTICON's October 5, 2006 letter.

25         31.     Notwithstanding the default entered against PRETEC, on or about October 19, 2006,

26  PRETEC filed a motion captioned, "Motion to Change Time," requesting a sixty-day continuance

27  of the November 29, 2006 Case Management Conference in *Acticon Technologies LLC v. Pretec*

28  *Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL), (Docket Entry 21).  This motion was

1  signed by Defendant TOMMY HO and Defendant GORDON YU.  A true and correct copy of the

2  Motion to Change Time is attached hereto as Exhibit "E", and incorporated by reference.

3        32.    On October 24, 2006, Defendant TOMMY HO contacted counsel for ACTICON via

4  telephone.  The following day, in a telephone conference between counsel for ACTICON and

5  Defendant TOMMY HO, Defendant TOMMY HO requested a description of the Accused Products

6  in the FIRST COMPLAINT and agreed to provide ACTICON with six years of annual sales

7  information for PRETEC's Accused Products.

8        33.    On October 26, 2007, Defendant TOMMY HO wrote in an e-mail message to

9  counsel for ACTICON, "Thanks for the information.  We will study the accused products as you

10  claimed.  If we agree, then we will prepare the past years of sales information.  If we disagree on

11  some of the accused products, we will contact you to discuss.  We will try to get as much sales

12  information as possible."

13        34.    Based on Defendant TOMMY HO's agreement on behalf of PRETEC to provide

14  sales information for the Accused Products to ACTICON, ACTICON did not oppose PRETEC's

15  Motion to Change Time and filed a Statement of Non-Opposition to Pretec's Motion to Change

16  Time on October 27, 2007 in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al*., Case

17  No. C 06-4679 JF (HRL), (Docket Entry 22).

18        35.    That same day, October 27, 2007, Pretec Technology, Inc. filed a Certificate of

19  Amendment of Articles of Incorporation with the California Secretary of State to change its

20  corporate name to PTI GLOBAL, INC.,

21        36.    On or about October 31, 2006, the Court granted PRETEC's motion in *Acticon*

22  *Technologies LLC v. Pretec Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL), and

23  continued the initial Case Management Conference scheduled for November 29, 2006 to February

24  2, 2007.  (Docket Entry 24).

25        37.    On or about November 28, 2006, one day prior to the originally scheduled Case

26  Management Conference, PRETEC filed a Certificate of Dissolution in the office of the Secretary

27  of State of California.  A true and correct copy of the Certificate of Dissolution is attached hereto as

28  Exhibit "F".  Despite PRETEC having been placed on actual notice of the patent infringement

1    lawsuit pending against it in the United States District Court for the Northern District of California,

2    Defendant CHIU FENG CHEN certified and declared under penalty of perjury in the Certificate of

3    Dissolution that, *inter alia*, "THE CORPORATION'S KNOWN DEBTS AND LIABILTIES

4    HAVE BEEN ACTUALLY PAID."

5        38.    PRETEC did not appear at the February 2, 2007 Case Management Conference in

6    *Acticon Technologies LLC v. Pretec Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL).

7        39.    ACTICON is informed and believes, and thereon alleges, that Defendants PTI

8    GLOBAL, INC., CHIU FENG CHEN, ROBERT WU, TOMMY HO, KUEI LU, GRACE YU,

9    GORDON YU and DOES 1 through 20 and each of them, continue to make, use, import, distribute,

10   offer for sale and/or sell the Accused Products, and possibly other products that infringe the

11   Patents-in-Suit, in the United States through Defendant PTI GLOBAL, INC..

12       40.    ACTICON is informed and believes, and thereon alleges, that Defendants PTI

13   GLOBAL, INC., CHIU FENG CHEN, ROBERT WU, TOMMY HO, KUEI LU, GRACE YU,

14   GORDON YU and DOES 1 through 20 and each of them, continue to make, use, import, distribute,

15   offer for sale and/or sell the Accused Products, and possibly other products that infringe the

16   Patents-in-Suit, in the United States through one or more unknown business entities.

17       41.    ACTICON is informed and believes, and thereon alleges, that DEFENDANTS

18   fraudulently transferred PRETEC's assets to Defendant PTI GLOBAL, INC. in order to continue

19   operating PRETEC's business, including the manufacture, distribution and sale of PCMCIA,

20   CompactFlash and Secure Digital I/O form factor electronic connectors in the United States, after

21   PRETEC's corporate dissolution.

22

23                          **GENERAL PATENT CLAIMS ALLEGATIONS**

24       42.    ACTICON is the sole and exclusive owner of United States Patent No. 4,603,320,

25   issued on July 29, 1986, entitled "Connector Interface."

26       43.    ACTICON is the sole and exclusive owner of United States Patent No. 4,543,450,

27   issued on September 24, 1985, entitled "Integrated Connector and Modem."

28       44.    ACTICON is the sole and exclusive owner of United States Patent No 4,972,470,

1    issued on November 20, 1990 entitled "Programmable Connector."

2         45.    ACTICON is the sole and exclusive owner of United States Patent No. 4,686,506,

3    issued on August 11, 1987, entitled "Multiple Connector Interface."

4         46.    The Patents-in-Suit describe various electronic connectors that convert signals

5    between a computer and certain external devices in order to obtain a desired connecting

6    configuration and/or function.

7         47.    ACTICON is informed and believes, and thereon alleges, that prior to on or about

8    November 28, 2006, PRETEC made, used, imported, distributed, offered for sale and/or sold

9    certain products in the United States that infringe upon the Patents-in-Suit, including, but not

10   limited to, CompactFlash form factor I/O devices such as Ethernet and Modem cards, Secure

11   Digital form factor I/O devices such as the Whanto Modem, PCMCIA form factor devices such as

12   Ethernet, Modem and Combo cards, as well as other CompactFlash, SDIO and PCMCIA form

13   factor devices which may be further identified during the course of discovery.

14        48.    Despite PRETEC having been placed on actual notice as to its infringing activity

15   prior to the filing of the FIRST COMPLAINT, PRETEC and/or DEFENDANTS, and each of them,

16   continued to refuse to cease and desist from their manufacture, distribution, importation, sale, or

17   offer for sale of the above-referenced Accused Products, and refused to enter into any licensing

18   agreements with ACTICON.

19        49.    After the filing of the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec*

20   *Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL), PRETEC and/or DEFENDANTS, and

21   each of them, failed and/or refused to cease and desist from their manufacture, distribution,

22   importation, sale, or offer for sale of the above-referenced Accused Products, and refused to enter

23   into any licensing agreements with ACTICON.

24        50.    ACTICON is informed and believes, and thereon alleges, that after PRETEC's

25   alleged dissolution on or about November 28, 2006, PTI GLOBAL, INC., the successor to

26   PRETEC, continued to make, use, import, distribute, offer for sale and/or sell certain PRETEC

27   brand products in the United States that infringe upon the Patents-in-Suit, including, but not limited

28   to, PRETEC brand CompactFlash form factor I/O devices such as Ethernet and Modem cards,

1   Secure Digital form factor I/O devices such as the Whanto Modem, PCMCIA form factor devices

2   such as Ethernet, Modem and Combo cards, as well as other CompactFlash, SDIO and PCMCIA

3   form factor devices which may be further identified during the course of discovery.

4        51.    ACTICON is informed and believes, and thereon alleges, that after PRETEC's

5   dissolution on or about November 28, 2006, Defendants CHIU FENG CHEN, TOMMY HO,

6   ROBERT WU, KUEI LU, GRACE YU, GORDON YU and DOES 1 through 20, on behalf of PTI

7   GLOBAL, INC. and/or DOES 1 through 20, continued to make, use, import, distribute, offer for

8   sale and/or sell certain PRETEC brand products in the United States that infringe upon the Patents-

9   in-Suit, including, but not limited to, PRETEC brand CompactFlash form factor I/O devices such as

10  Ethernet and Modem cards, Secure Digital form factor I/O devices such as the Whanto Modem,

11  PCMCIA form factor devices such as Ethernet, Modem and Combo cards, as well as other

12  CompactFlash, SDIO and PCMCIA form factor devices which may be further identified during the

13  course of discovery.

14                          **COUNT I**

15              **Successor Liability – All Patents-in-Suit**
                         **(Against PTI GLOBAL)**
16

17       52.    ACTICON repeats and realleges each of the allegations set forth in paragraphs 1

18  through 51, as though fully set forth herein.

19       53.    ACTICON is informed and believes, and thereon alleges, that prior to PRETEC'S

20  dissolution on or about November 28, 2006, PRETEC made, used, imported, distributed, offered

21  for sale and/or sold the Accused Products, and possibly other products that infringe the Patents-in-

22  Suit through PTI GLOBAL, INC., and/or DOES 1 through 20.

23       54.    ACTICON is informed and believes, and thereon alleges, that PRETEC and PTI

24  GLOBAL, INC. share the same shareholders and directors.

25       55.    ACTICON is informed and believes, and thereon alleges, that PRETEC transferred

26  its assets to PTI GLOBAL for the fraudulent and wrongful purpose of avoiding liability on the

27  claims ACTICON asserted against PRETEC in the FIRST COMPLAINT in *Acticon Technologies*

28  *LLC v. Pretec Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL).

1    56.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

2    is a mere continuation of PRETEC.   ACTICON is further informed and believes, and thereon

3    alleges, that PTI GLOBAL, INC. carries on the same business that PRETEC was engaged in prior

4    to PRETEC's dissolution, namely the manufacture, use, importation, distribution, offering for sale

5    and/or selling of PCMCIA, CompactFlash and Secure Digital I/O form factor electronic connectors.

6    57.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

7    continues to make, use, import, distribute, offer for sale and/or sell the Accused Products under the

8    PRETEC brand, and possibly other products that infringe the Patents-in-Suit.  ACTICON is

9    informed and believes, and thereon alleges, that PTI GLOBAL, INC. sells exclusively PRETEC

10   products, including, but not limited to, the Accused Products.

11   58.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

12   sells PRETEC products online at various locations on the world wide web, including, but not

13   limited to, PTI GLOBAL, INC.'s web site, located at www.ptiglobalusa.com.  The homepage of

14   PTI GLOBAL, INC.'s web site contains the header, "Flash Memory Innovation by PRETEC."

15   59.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

16   also sells PRETEC products online at PTI GLOBAL, INC.'s storefront in Amazon.com's online

17   marketplace, located at http://www.amazon.com/shops/pti_global.  The "About PTI Global Inc."

18   section of PTI GLOBAL, INC.'s storefront, states, "Since 1993, PRETEC brand has been

19   recognized internationally for it's [sic] experience in pioneering innovative and quality products

20   offered to the data storage, mobile computing and industrial markets.  PRETEC brand is focused on

21   global markets providing it's [sic] full-line of own brand-name products:  USB device storage,

22   Flash memory Card storage, Multi-Media solution, Mobile Peripherals, Multi-Function, Industrial

23   storage and Accessory.  PRETEC brand products with unique ID design and highest reliability

24   create PRETEC's winning formula, reaching the customer's needs and enhancing your digital

25   world."

26   60.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.'s

27   web site lists PTI GLOBAL, INC.'s address as "231 Whitney Place, Fremont, CA  94539" and lists

28   PTI GLOBAL, INC.'s telephone number as "510-249-9055."  *See*

1    *http://www.ptiglobalusa.com/info.html*.  ACTICON is informed and believes, and thereon alleges,

2    that the Technical Contact for PRETEC listed on the WHOIS record for "pretec.com" is an

3    individual whose address is "231 Whitney Place, Fremont, CA  94539" and whose telephone

4    number is "510-249-9055."

5           61.     ACTICON is informed and believes, and thereon alleges, that an Internet search for

6    "Pretec Electronics Corporation" in "Fremont, California," performed at the web site

7    www.google.com/maps returns an address of "231 Whitney Place, Fremont, CA  94539" and a

8    phone number of "(510) 249-9055."  ACTICON is informed and believes, and thereon alleges, that

9    an Internet search for "Pretec Electronics Corporation" in "Fremont, California," performed at the

10   web site www.maps.yahoo.com also returns an address of "231 Whitney Place, Fremont, CA

11   94539" and a phone number of "(510) 249-9055."

12          62.     ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

13   is a successor corporation to PRETEC.  ACTICON is informed and believes, and thereon alleges,

14   that (1) PTI GLOBAL INC. shares practically the same shareholders and directors as PRETEC; (2)

15   that PRETEC transferred substantially all of its assets to PTI GLOBAL, INC., but PTI GLOBAL,

16   INC. did not pay certain of PRETEC's debts or liabilities; and (3) that PTI GLOBAL, INC. carries

17   on the same business as PRETEC conducted prior to PRETEC's dissolution.

18          63.     PRETEC's conduct in making, using, importing, distributing, offering for sale

19   and/or selling the Accused Products, and possibly other infringing products, constituted an

20   infringement of ACTICON'S rights under the Patents-in-Suit.

21          64.     ACTICON has been damaged by PRETEC's infringing conduct, and as PRETEC's

22   successor, PTI GLOBAL, INC. therefore is liable to ACTICON for actual damages suffered by

23   ACTICON and any profits realized on the sale of the Accused Products which are not taken into

24   account in the computation of actual damages, as well as any statutory damages, such as treble

25   damages.

26          65.     ACTICON is informed and believes, and thereon alleges, that PRETEC's

27   infringement of the Patents-in-Suit prior to PRETEC's dissolution was willful and deliberate.

28          WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

## COUNT II

**Patent Infringement (Alter Ego) – All Patents-in-Suit**
**(Against CHIU FENG CHEN, TOMMY HO, ROBERT WU,**
**GRACE YU, KUEI LU and GORDON YU)**

66.    ACTICON repeats and realleges each of the allegations set forth in paragraphs 1 through 65, as though fully set forth herein.

67.    ACTICON is informed and believes, and thereon alleges, that Defendants CHIU FENG CHEN, TOMMY HO, ROBERT WU, GRACE YU, KUEI LU and GORDON YU (hereinafter collectively "INDIVIDUAL DEFENDANTS") were officers, directors and/or majority shareholders of PRETEC.

68.    ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL DEFENDANTS, and each of them, are the alter ego of PRETEC in that the INDIVIDUAL DEFENDANTS, among other actions and omissions:  (1) commingled funds and other assets, failed to segregate funds of separate entities, and made unauthorized diversions of corporate funds and assets to other than corporate uses; (2) treated the assets of PRETEC as their own; (3) failed to maintain minutes and adequate corporate records and caused the confusion of the records of separate entities; (4) used PRETEC as a mere shell, instrumentality and conduit for a single venture and business of their own device; (5) disregarded the legal formalities of the corporation, and failed to maintain arms-length relationships with PRETEC and their other affiliate entities; (6) used PRETEC's corporate entity to procure labor, services and merchandise for their own benefit and the benefit of their other affiliated entities; and (7) diverted assets of PRETEC to themselves and/or their other affiliated entities, to the detriment of PRETEC's creditors.

69.    ACTICON is informed and believes, and thereon alleges, that PRETEC was influenced and governed by the INDIVIDUAL DEFENDANTS and that there is such a unity of interest and ownership that the individuality, or separateness of PRETEC and the INDIVIDUAL DEFENDANTS has ceased and that the INDIVIDUAL DEFENDANTS are the alter ego of PRETEC.  ACTICON is further informed and believes, and thereon alleges, that the facts are such that an adherence to the fiction of the separate existence of the PRETEC corporation from the INDIVIDUAL DEFENDANTS would sanction fraud and promote injustice.

70.   ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL DEFENDANTS, in their capacities as officers, directors and/or majority shareholders of PRETEC, had been placed on notice of the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL), and of PRETEC's alleged infringing activity.

71.   ACTICON is informed and believes, and thereon alleges, that despite the INDIVIDUAL DEFENDANTS having been placed on notice of the FIRST COMPLAINT, the INDIVIDUAL DEFENDANTS continued to allow and/or assented to PRETEC's making, using, importing, distributing, offering for sale and/or selling the Accused Products.

72.   PRETEC's conduct in making, using, importing, distributing, offering for sale and/or selling the Accused Products, and possibly other infringing products, constituted an infringement of ACTICON'S rights under the Patents-in-Suit.

73.   ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL DEFENDANTS actively induced others to infringe, and/or commit acts of contributory infringement of one or more claims of the Patents-in-Suit, through their activities related to making, using, importing, distributing, offering for sale and/or selling the Accused Products, all in violation of 35 U.S.C. § 271.

74.   ACTICON has been damaged by PRETEC's infringing conduct, and as the officers, directors and/or majority shareholders of PRETEC, the INDIVIDUAL DEFENDANTS therefore are liable to ACTICON for actual damages suffered by ACTICON, and any profits realized on the sale of the Accused Products which are not taken into account in the computation of actual damages, as well as any statutory damages, such as treble damages.

75.   ACTICON is informed and believes, and thereon alleges, that PRETEC's infringement of the Patents-in-Suit prior to PRETEC's dissolution was willful and deliberate.

76.   ACTICON has been damaged by the actions of the INDIVIDUAL DEFENDANTS in that the INDIVIDUAL DEFENDANTS have transferred the assets and corporate funds of PRETEC to deprive PRETEC of the monies and ability to meet its obligations for liability under the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al.*, Case

1    No. C 06-4679 JF (HRL).

2          77.     ACTICON hereby asserts its claim to recovery of any sums not paid by PRETEC for

3    PRETEC's infringing conduct against the officer, director and majority shareholder INDIVIDUAL

4    DEFENDANTS.

5          WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

6

7                                    **COUNT III**

8              **Patent Infringement (Vicarious Liability) – All Patents-in-Suit**
               **(Against CHIU FENG CHEN, TOMMY HO, ROBERT WU,**
9                      **GRACE YU, KUEI LU and GORDON YU)**

10         78.     ACTICON repeats and realleges each of the allegations set forth in paragraphs 1

11   through 77, as though fully set forth herein.

12         79.     ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL

13   DEFENDANTS fraudulently and wrongfully transferred the assets of PRETEC to PTI GLOBAL,

14   INC. and committed other acts not yet known to Plaintiff in order to avoid liability on the claims

15   asserted against PRETEC in the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec*

16   *Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL).

17         80.     ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL

18   DEFENDANTS are the officers, directors and/or majority shareholders of PTI GLOBAL, INC.

19         81.     ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.'s

20   infringement of the Patents-in-Suit subsequent to PRETEC's dissolution has been and continues to

21   be willful and deliberate.

22         82.     ACTICON has been damaged by the actions of the INDIVIDUAL DEFENDANTS

23   in that the INDIVIDUAL DEFENDANTS have transferred the assets and corporate funds of

24   PRETEC to deprive PRETEC of the monies and ability to meet its obligations for liability under

25   the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al*., Case

26   No. C 06-4679 JF (HRL).

27         83.     ACTICON hereby asserts its claim to recovery of any sums not paid by PRETEC for

28   PRETEC's infringing conduct against the officer, director and majority shareholder INDIVIDUAL

1  DEFENDANTS.

2      WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

3
                                   **COUNT IV**
4
                  **Fraudulent Transfer – Civil Code § 3439 et seq.**
5                        **(Against ALL DEFENDANTS)**

6      84.    ACTICON repeats and realleges each of the allegations set forth in paragraphs 1

7  through 83, as though fully set forth herein.

8      85.    ACTICON is informed and believes, and thereon alleges, that PRETEC, PTI

9  GLOBAL, INC. and/or the INDIVIDUAL DEFENDANTS fraudulently transferred PRETEC's

10 assets to PTI GLOBAL, INC. with the intent to hinder, delay or defraud ACTICON in pursuing its

11 claims arising out of the FIRST COMPLAINT against PRETEC in *Acticon Technologies LLC v.*

12 *Pretec Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL).

13     86.    ACTICON is informed and believes, and thereon alleges, that in order to remove its

14 assets and conceal the transfer of its assets, PRETEC filed for corporate dissolution with the

15 California Secretary of State in November 2006.

16     87.    ACTICON is informed and believes, and thereon alleges, that PRETEC, PTI

17 GLOBAL, INC. and/or the INDIVIDUAL DEFENDANTS transferred PRETEC's assets to PTI

18 GLOBAL, INC. without receiving a reasonably equivalent value in exchange for the transfer and

19 were engaged in a transaction (or series of transactions) for which its remaining assets were

20 unreasonably small in relation to the transactions.

21     88.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

22 shares the same officers, directors and majority shareholders as the officers, directors and majority

23 shareholders that PRETEC possessed prior to PRETEC's dissolution.

24     89.    ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL

25 DEFENDANTS were officers, directors and/or majority shareholders of PRETEC prior to

26 PRETEC's dissolution in or about November 2006.  ACTICON is informed and believes, and

27 thereon alleges, that the INDIVIDUAL DEFENDANTS are the officers, directors and/or majority

28 shareholders of PTI GLOBAL, INC.

1    90.    ACTICON is informed and believes, and thereon alleges, that PRETEC did not

2    cease its business operations despite filing a Certificate of Corporate Dissolution with the

3    California Secretary of State.  ACTICON is informed and believes, and thereon alleges, that

4    PRETEC continues to do business in the United States under the PRETEC ELECTRONICS

5    CORPORATION brand and name and also does business as PTI GLOBAL, INC.

6    91.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

7    sells only PRETEC brand products on its web site, located at www.ptiglobalusa.com.  ACTICON is

8    further informed and believes, and thereon alleges, that PTI GLOBAL, INC.'s web site was

9    registered in or about February 2007, approximately two months after PRETEC's dissolution.

10    92.    ACTICON is further informed and believes, and thereon alleges, that PRETEC

11    issued a press release on or about April 4, 2007, announcing its new Ruggedized Industrial

12    CompactFlash card.  A true and correct copy of the April 4, 2007 press release is attached hereto as

13    Exhibit "G", and incorporated by reference.

14    93.    ACTICON is informed and believes, and thereon alleges, that PTI GLOBAL, INC.

15    has been and continues to be PRETEC's United States company headquarters office.

16    94.    ACTICON has been damaged by PRETEC's and/or the INDIVIDUAL

17    DEFENDANTS' fraudulent and wrongful transfer of assets to PTI GLOBAL, INC., which prevents

18    ACTICON from collecting any monies due to ACTICON for PRETEC's liabilities under the

19    FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al.*, Case No. C

20    06-4679 JF (HRL).

21    95.    ACTICON hereby asserts its claim to recovery of any sums not paid by PRETEC

22    ELECTRONICS CORPORATION against the officer, director and majority shareholder

23    INDIVIDUAL DEFENDANTS.

24    WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

25

26

27

28

## COUNT V

### Conspiracy to Fraudulently Transfer Assets
### (Against ALL DEFENDANTS)

96.    ACTICON repeats and realleges each of the allegations set forth in paragraphs 1 through 95, as though fully set forth herein.

97.    ACTICON is informed and believes, and thereon alleges, that DEFENDANTS agreed to engage in and engaged in a common course of conduct to fraudulently transfer PRETEC's assets to PTI GLOBAL, INC. with the intent to hinder, delay or defraud ACTICON in pursuing its claims against PRETEC arising out of the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec Electronics Corp., et. al.*, Case No. C 06-4679 JF (HRL).

98.    ACTICON is informed and believes, and thereon alleges, that in furtherance of the conspiracy, DEFENDANTS transferred PRETEC's assets without receiving a reasonably equivalent value in exchange for the transfer and were engaged in a transaction (or series of transactions) for which PRETEC's remaining assets were unreasonably small in relation to the transactions.

99.    ACTICON is informed and believes, and thereon alleges, that DEFENDANTS committed the acts described in paragraphs 97 and 98 intentionally and in furtherance of the conspiracy to commit the unlawful transfer of PRETEC's assets.

100.    As a result of the above-described fraudulent conveyance, ACTICON has been damaged in an amount according to proof at trial.

WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

## COUNT VI

### Improper Dissolution
### (Against ALL DEFENDANTS)

101.    ACTICON repeats and realleges each of the allegations set forth in paragraphs 1 through 100, as though fully set forth herein.

102.    ACTICON is informed and believes, and thereon alleges, that the INDIVIDUAL DEFENDANTS and/or DOES 1 THROUGH 20 participated in a voluntary proceeding for winding

1   up PRETEC.

2       103.    ACTICON is informed and believes, and thereon alleges, that PRETEC failed to

3   cease business, all in violation of California Corporations Code Section 1903(c).

4       104.    ACTICON is informed and believes, and thereon alleges, that PRETEC improperly

5   filed for corporate dissolution with the California Secretary of State despite knowing of PRETEC's

6   potential liabilities under the claims set forth in the FIRST COMPLAINT in *Acticon Technologies*

7   *LLC v. Pretec Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL).

8       105.    ACTICON is informed and believes, and thereon alleges, that PRETEC fraudulently

9   signed a certificate of dissolution stating that PRETEC's known debts and liabilities have been

10  actually paid, or adequately provided for, or paid or adequately provided for as far as its assets

11  permitted or that it has incurred no known debts or liabilities when in fact, PRETEC's liabilities

12  under the claims set forth in the FIRST COMPLAINT in *Acticon Technologies LLC v. Pretec*

13  *Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL), had not been paid or adequately provided

14  for, all in violation of California Corporations Code Section 1905(a)(2).

15      106.    ACTICON is informed and believes, and thereon alleges, that PRETEC dissolved its

16  corporation and fraudulently and wrongfully transferred its assets to PTI GLOBAL, INC. in order

17  to avoid liability for the claims set forth in the FIRST COMPLAINT in *Acticon Technologies LLC*

18  *v. Pretec Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL).

19      107.    ACTICON has been damaged by the actions of the INDIVIDUAL DEFENDANTS

20  and/or DOES 1 through 20 in that the INDIVIDUAL DEFENDANTS and/or DOES 1 through 20,

21  having fraudulently and wrongfully executed PRETEC's certificate of dissolution and having

22  transferred the assets and corporate funds of PRETEC to deprive PRETEC of the monies and

23  ability to meet its obligations for liability under the FIRST COMPLAINT in *Acticon Technologies*

24  *LLC v. Pretec Electronics Corp., et. al*., Case No. C 06-4679 JF (HRL), improperly filed for the

25  corporate dissolution of PRETEC.

26      WHEREFORE, ACTICON seeks relief as set forth in the Prayer, below.

27

28

1    **PRAYER FOR RELIEF**

2    WHEREFORE, ACTICON prays for judgment against DEFENDANTS as follows:

3    1.    On Count I, for judgment that PTI GLOBAL, INC. has infringed the Patents-in-Suit.

4    2.    On Count I for judgment that PTI GLOBAL, INC. has induced infringement of the

5    Patents-in-Suit;

6    3.    On Counts I, for judgment that PTI GLOBAL INC.'s infringement of the Patents-In-

7    Suit is, and has been, willful and deliberate;

8    4.    On Count II, for judgment that the INDIVIDUAL DEFENDANTS, and each of

9    them, are the alter ego of PRETEC, for damages suffered by ACTICON as a consequence of

10    DEFENDANTS' actions herein and for exemplary and punitive damages;

11    5.    On Counts II and III, for judgment that the INDIVIDUAL DEFENDANTS, and

12    each of them, have infringed the Patents-in-Suit;

13    6.    On Counts II and III, for judgment that the INDIVIDUAL DEFENDANTS, and

14    each of them, induced the infringement of the Patents-in-Suit;

15    7.    On Counts II and III, for judgment that the INDIVIDUAL DEFENDANTS, and

16    each of them, contributorily infringed the Patents-in-Suit;

17    8.    On Count III, for judgment that the INDIVIDUAL DEFENDANTS, and each of

18    them, are vicariously liable for the damage and harm caused by PRETEC's infringing conduct;

19    9.    On Count IV, for judgment that DEFENDANTS, and each of them, fraudulently

20    transferred the assets of PRETEC, for damages suffered by ACTICON as a consequence of

21    DEFENDANTS' actions herein and for exemplary and punitive damages;

22    10.    On Count V, for judgment that DEFENDANTS, and each of them, conspired to

23    fraudulently transfer the assets of PRETEC;

24    11.    On Count VI, for judgment that DEFENDANTS, and each of them, improperly

25    dissolved PRETEC; for damages suffered by ACTICON as a consequence of DEFENDANTS'

26    actions herein and for exemplary and punitive damages.

27    12.    On Counts I, II, and III, for an award of damages pursuant to 35 U.S.C. § 284

28    adequate to compensate ACTICON for DEFENDANTS' infringement of the Patents-In-Suit; but

1  not less than a reasonable royalty, with interest, including pre-judgment interest, and a trebling of

2  such damages in view of the willful and deliberate nature of the infringement;

3      13.    On Counts I, II, and III, for costs, including expenses and reasonable attorney's fees

4  pursuant to 35 U.S.C. §§ 284 and 285; and

5      14.    For further and/or alternative relief as deemed just and proper.

6

7  Dated:  August __28__, 2007            CARR & FERRELL *LLP*

8

9                              By: _Christine S. Watson_____
10                                  ROBERT J. YORIO
                                    COLBY B. SPRINGER
                                    CHRISTINE S. WATSON
11
12                                  Attorneys for Plaintiff
                                    ACTICON TECHNOLOGIES LLC
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                              Complaint for Patent Infringement, etc.

1

## DEMAND FOR JURY TRIAL

2

3      Plaintiff ACTICON TECHNOLOGIES LLC hereby demands a jury trial of all issues in the

4  above-captioned action which are triable to a jury.

5

6  Dated:  August _28_, 2007                    CARR & FERRELL *LLP*

7

8                                    By: _____

9                                        ROBERT J. YORIO
                                         COLBY B. SPRINGER
                                         CHRISTINE S. WATSON
10

11                                       Attorneys for Plaintiff
                                         ACTICON TECHNOLOGIES LLC

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Complaint for Patent Infringement, etc.

# United States Patent [19]

## Farago

[11] **Patent Number:** **4,603,320**

[45] **Date of Patent:** **Jul. 29, 1986**

[54] **CONNECTOR INTERFACE**

[75] Inventor: **Steven Farago,** Mount Kisco, N.Y.

[73] Assignees: **Anico Research, Ltd. Inc.,** Mount Kisco; **Rapitech Systems Inc.,** New York, both of N.Y.

[21] Appl. No.: **484,823**

[22] Filed: **Apr. 13, 1983**

[51] Int. Cl.⁴ ............................................. H03K 13/24

[52] U.S. Cl. ..................... 340/347 DD; 339/176 MP; 361/394

[58] Field of Search ............. 340/347 DD; 339/17 R, 339/17 C, 17 F, 14 R, 17 M, 17 LC, 17 N, 176 R, 176 M, 176 MP; 361/392–395, 412, 415; 364/705–771; 179/20 P

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,643,135 | 2/1972 | Devort et al. | 361/395 |
| 3,885,167 | 5/1975 | Berglund | 340/347 DD |
| 4,027,941 | 6/1977 | Narozny | 339/14 R |
| 4,124,888 | 11/1978 | Washburn | 364/200 |
| 4,217,624 | 8/1980 | Tuck | 361/394 |
| 4,262,981 | 4/1981 | Goodman | 339/17 LC |
| 4,295,181 | 10/1981 | Chang et al. | 361/395 |
| 4,342,069 | 7/1982 | Link | 361/401 |
| 4,361,955 | 12/1982 | Lancaster | 339/17 F |
| 4,458,967 | 7/1984 | King et al. | 339/14 R |
| 4,487,464 | 12/1984 | Kirschenbaum | 339/19 |

*Primary Examiner*—Vit W. Miska
*Attorney, Agent, or Firm*—Israel Nissenbaum

[57] **ABSTRACT**

A connector interface for enabling communications between first and second data handling systems wherein the data in the first system is arranged in a first type of format and the data in the second system is arranged in a second type of format, includes a connector housing with first and second sets of electrical contact elements exposed at different portions of the housing. Circuitry contained entirely within the housing operates to convert data transmitted to the first set of contact elements from the first data handling system into corresponding data in the second type of format for transmission to the second data handling system through the second set of contact elements, and to convert data transmitted to the second set of contact elements from the second data handling system into corresponding data in the first format for transmission to the first data handling system. One set of electrical contact elements may, for example, be arranged to extend out from the connector housing in two parallel rows to allow the elements to be directly connected to corresponding terminals arranged in a dual in line configuration on an outside printed circuit board. The connector arrangement greatly simplifies the design and construction of data processing systems requiring specific interfaces between certain parts of the systems, such as between data terminal equipment and data communication equipment employing serial binary data interchange.

**23 Claims, 7 Drawing Figures**





EXHIBIT A



## FIG.1
### PRIOR ART



## FIG.2



FIG.3



FIG.4



FIG.5



FIG.6A



FIG.6B

4,603,320

**1**

## CONNECTOR INTERFACE

### BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates generally to elelctrical connectors, and particularly to a connector having internal circuitry capable of providing a specified electrical interface between various types of data handling equipment.

2. Description of the Prior Art

The proliferation of digital data processing equipment, first in business and now into the home, has created an ongoing demand for such equipment with ever increased capabilities but at an affordable price. The modern trend to integrate numerous discrete electrical components within single semiconductor integrated circuits or "chips", has provided for greater economies in the manufacture of digital electronic equipment. Not only is the overall physical size and weight of the equipment reduced through use of integrated circuit technology, but manufacturing costs also are alleviated in that the price of each integrated circuit used is but a fraction of the total cost represented by all the components it contains.

Digital data processing systems which are in common use today include portions arranged to allow the user to communicate with the system by way of, for example, a terminal or a printer. The user "talks" or provides information to the system through the terminal, and this information is converted into digital data which the system is capable of understanding. After the data is processed by the system which may include some form of computer, a suitable response is transmitted back to the user in digital form and then properly converted into visibly recognizable words or symbols on the screen of the terminal or on a sheet generated by a printer.

Accordingly, it is often necessary to provide cable interconnections between differently located units of a data processing system to allow the units to transmit and receive digital data to and from one another.

Certain types of digital equipment, e.g. a terminal or a printer, transmit or receive digital data in serial bit format. That is, each character (i.e., letter or numeral) of the data is sent or received one bit at a time. It will be appreciated that in a typical system where each character occupies multiple bits, communicating the characters as serial bits between separately located pieces of equipment reduces significantly the number of separate conductors which must be provided in the connecting cables, allows for the communicating equipments to operate in time synchronism with one another with regard to the data exchanged between them, as well as for the use of parity bits and other common error detecting techniques to be applied for each data character communicated. Other kinds of equipment in data handling systems operate in a parallel bit format. For example, computers operate on data which is loaded into internal registers one full character (i.e., eight bits) at a time, and likewise provide output information a character at a time to internal output registers.

In order to insure compatability between terminals, printers and other input/output data handling equipment which operate in a serial bit format, and computer mainframes and related equipment, the electronic Industries Association promulgated in 1969 a now widely accepted interface standard known as EIA RS-232-C,

**2**

the provisions of which are incorporated by reference herein. The RS-232-C Standard, entitled "Interface Between Data Terminal Equipment and Data Communication Equipment Employing Serial Binary Data Interchange", ensures that serial bit format equipment produced by one manufacturer will operate properly with serial bit format equipment of another manufacturer. The RS-232-C Standard applies not only to the interchange of information data signals between data handling equipment, but also to the interchange of timing and control data signals between such equipment (Sec. 1.4 of the Standard).

In order to ensure satisfactory noise immunity of the data signals to be communicated over connecting cables, the RS-232-C Standard provides that the data signals transmitted over the cables have magnitudes of at least ±6 volts (See Sec. 2.3 of the Standard). Since most data handling equipment today operate at five-volt levels, the Standard makes necessary additional power supplies for enabling a voltage level conversion of the data signals to be interchanged over the connecting cable.

With regard to mechanical characteristics of the interface, the RS-232-C Standard states that the interface is "located at a pluggable connector signal interface point between the two equipments. The female connector . . . should be mounted in a fixed position near the data terminal equipment". (Sec. 3.1). FIG. 3.1 within the RS-232-C Standard assigns certain circuit functions to each of 25 connector pins associated with the pluggable connector at the signal interface point. While the Standard does not specify a particular type of multiple pin connector (See Appendix I to the Standard), the "D-type" 25 pin connector (for example, AMP type 206584-1) has essentially become an industry standard.

A printed circuit board together with circuit components and software necessary to achieve an RS-232-C interface between a computer terminal on one side, and modems or serial line printers on the other side, is available from a variety of manufacturers. Such boards are mountable inside the computer, and separate cable is provided. These boards are compatible from the RS-232-C side but they differ on the computer side from computer to computer.

The known RS-232-C interfaces which include a printed circuit board are arranged physically as shown in FIG. 1. The board B can be a "stand alone card" and be connected via a card cage connector (not shown) to various parallel signal bus lines associated with a microprocessor in a computer or other terminal equipment (also not shown). Alternatively, it can be a part of a more complex board. The RS-232-C Standard 25-pin connector CON may be mounted along one edge of the board B as shown, and the pins directly connected electrically to printed conductors on the board by soldering as at points S on the underside of the board B. This leaves the female connector part F fixedly mounted near the data terminal equipment as required by the Standard. The various conductors to which the pins of the connector CON are connected lead to electrical circuitry arranged over other portions of the board B, including, for example, a main logic chip IC 1, line driver IC 3, line receiver IC 4, crystal oscillator OSC, frequency divider IC 2, and a number of discrete components C.

It will be appreciated that the known RS-232-C interface board arrangements require that a certain amount

4,603,320

3

of space be allocated in existing equipment for their insertion, such space often being at a premium in units intended to be portable and of small overall dimensions. As far as is known, there has been no attempt to integrate any electrical interface circuitry, including those components required to implement the RS-232-C interface as shown in FIG. 1, within the prescribed interface connector itself such as the 25-pin connector CON.

A connector is known from U.S. Pat. No. 3,790,858 to Brancaleone et al within which RF filter elements are connected to a number of parallel pin-like contact elements which are supported inside and extend axially through a cylindrical shell. The filter elements are connected internally between the contact elements and a common cylindrical metal ground plate.

## SUMMARY OF THE INVENTION

A primary object of the present invention is to provide a connector which exhibits simultaneously both the electrical characteristics and the connector requirements of a specified interface between two different data handling systems or equipments.

Another object of the invention is to provide a method wherein electrical circuitry for carrying out a specified function between two different data handling systems is integrated within a connector housing so as to reduce significantly spatial requirements within equipment associated with the systems.

According to one aspect of the invention, a connector includes a housing having a first set and a second set of terminals extending at least partly through wall parts of the housing to engage corresponding terminals of first and second outside connection means associated with first and second data handling systems, respectively. Logic interface circuit means is arranged within the connector housing and coupled between the first and second set of terminals. The circuit means operates to convert data signals transmitted to the first set of terminals from the first data handling system in a first type of format into corresponding data signals in a second type of format, and to provide the corresponding data signals in the second type of format to the second set of terminals for transmisson to the second data handling system. The circuit means also operates to convert data signals transmitted to the second set of terminals from the second data handling system in a second type of format into corresponding data signals in a first type of format, and to provide the corresponding data signals in the first type of format to the first set of terminals for transmission to the first data handling system.

According to another aspect of the invention, a method of implementing a logical interface to enable communications between a first data handling system in which data signals are arranged in a first type of format, and a second data handling system in which data signals are arranged in a second type of format, includes the steps of providing a connector housing; supporting first and second sets of electrical contact elements on the housing; containing electrical circuitry within the connector housing and connecting the circuitry with the first and the second sets of contact elements by arranging conductors inside the housing; converting by way of the electrical circuitry data signals transmitted to the first set of electrical contact elements in a first type of format from a first data handling system outside the connector housing into corresponding data signals in a second type of format and providing same to the second set of electrical contact elements through the conduc-

4

tors inside the connector housing; and converting by way of the electrical circuitry data signals transmitted to the second set of electrical contact elements in the second type of format from a second data handling system outside the connector housing into corresponding data signals in the first type of format and providing same to the first set of electrical contact elements through the conductors inside the connector housing.

The invention will be more clearly understood upon reading the following detailed description of preferred embodiments thereof in conjunction with the accompanying drawing.

## BRIEF DESCRIPTION OF THE DRAWING

In the drawing:

FIG. 1 is a perspective view of a conventional serial interface arranged on a portion of a printed circuit board;

FIG. 2 is a perspective view, with parts broken away, showing a first embodiment of a connector according to the present invention mounted on a printed circuit board;

FIG. 3 is a schematic diagram representing electrical circuitry contained in the housing of the connector in FIG. 2;

FIG. 4 is a perspective view of a second embodiment of a connector according to the present invention;

FIG. 5 is a perspective view of a third embodiment of a connector according to the present invention;

FIG. 6A is a top plan view of a printed circuit layout, and the phantom outline of the components, of the electrical circuitry seen in the schematic diagram of FIG. 3; and

FIG. 6B is a bottom plan view of the printed circuit board illustrating the interconnection among the various components.

## DETAILED DESCRIPTION OF THE INVENTION

FIG. 2 shows a first embodiment of a connector 10 according to the invention, the connector 10 being mounted on a printed circuit board 12 associated with a data handling system or equipment (not shown) in which data is interchanged in a parallel format. The connector 10 includes a connector housing 14, portions of which are omitted in FIG. 2 for the purpose of illustrating electrical circuitry 16 mounted in the interior space of the housing 14. It is preferable that walls of the housing 14 substantially enclose the interior space so as to protect the circuitry 16 contained therein.

As shown in FIG. 2, the housing 14 is in the form of a generally rectangular hollow block and includes a front wall 18, a part of which projects outwardly to define first outside connection surface 20 parallel to the inside surface of wall 18. Housing 14 also includes a bottom wall 22 the outside surface of which defines a second outside connection surface 24. The outside dimensions of the housing 14, particularly those of the front wall 18 together with the first outside connection surface 20, preferably conform to those of a standard socket connector, thereby being adapted to mate with a standard plug connector or corresponding or complementary configuration. For applications in the RS-232-C interface, the housing 14 should conform to the dimensions of the known 25-pin "D type" subminiature connector mentioned earlier. Typical dimensions for the housing 14 thus may be a height H of about 0.5

4,603,320

5

inches (12.70 mm.), a depth D of about 1.2 inches (30.48 mm.) and a width W of about 2.0 inches (50.80 mm.).

The electrical circuitry 16 includes, in the embodiment of FIG. 2, a carrier in the form of a single printed circuit board or substrate 26 mounted closely adjacent and parallel to the inside surface of the bottom wall 22. Various integrated circuits and discrete components are mounted on the board 26, and are electrically connected by soldering, or by other technology, to conductors on one or both sides of the board 26.

The various "chips" and components shown in FIG. 2 as contained within the connector housing 14 on the board 26, and represented schematically in FIG. 3, include integrated circuits U1–U6; four tantalum chip capacitors C1–C4; a set of five chip capacitors C5–C9; a quartz crystal Q1; a toroid core transformer TR1 having bifilar wound primary and secondary windings T1–T2 and T4–T6; and a Graetz diode bridge G1. Each of eight conductors L extends from a different one of eight connection points on the printed circuit board 26 (FIG. 2), to corresponding female electrical contact elements or terminals J2–J8 and J20 which extend partly through and are supported in openings in the wall 18. The outside ends of the female contact elements are exposed at the first outside connection surface 20 to engage corresponding pins of an outside plug connector (not shown). The numbers assigned to the female contact elements J2–J8 and J20 correspond to the pin number-circuit function assigments prescribed in the RS-232-C Standard, mentioned earlier. Further, 24 male electrical contact elements or pins P1–P24 extend in two parallel rows of 12 pins each, downwardly from connection points near the long edges of the board 26 (FIG. 2), to engage openings in printed conductors or a conventional dual in line socket on the outside printed circuit board 12, at the second outside connection surface 24.

In accordance with a preferred technique of manufacture, the housing 14, except for the bottom wall 22, is molded in one piece; the elements or terminals J2–J8 and J20, as well as the conductors L, being included in the molding operation. Then, the bottom wall 22 and abutting printed circuit board 26 are snapped into position in the housing. By means of localized heating, the bottom wall is fused to the housing so that a completely unitary structure is achieved.

FIG. 3 shows the interconnections between the chips and other electrical components on the printed circuit board 26 contained within the connector housing 14, together with the female and the male contact elements arranged on the first and the second outside connection surfaces 20, 24 of the connector 10, respectively. The circuitry of FIG. 3 is one example of circuitry which functions to provide the electrical characteristics of an RS-232-C interface, but it will be appreciated that different circuitry may be integrated within the connector housing 14 to carry out the same function or other commonly used interfaces including 8-bit Parallel, GPIB (general purpose interface bus-IEEE 488), and Ethernet.

The integrated circuit U1 may be, for example, National Semiconductor type INS 8250A. The circuit U1 serves as a main logic element which handles all data signal interchanges between, e.g., a microprocessor (not shown) which handles data in a parallel bit format and communications equipment (not shown) which sends and receives serial bit data. Circuit U1 contains several programmable registers which determine the communi-

6

cations format and all the necessary information data to perform successfully a two-way data interchange between two data systems of different data formats. Specifically, before sending or receiving any data via an RS-232-C line, a controlling microprocessor (not shown) must load the internal registers with the required commands. The system software contains the following load functions which, when programmed within circuit U1, enable the latter to be used for data communications. The preprogrammed functions are:

   1. Baud rate and baud rate factor;
   2. Character length;
   3. Number of stop bits;
   4. Parity enable/disable and parity polarity;
   5. Modem control functions; and
   6. Additional operational conditions.

Instructions representing the above load functions are transmitted to the circuit U1 from an outside microprocessor (not shown) over data bus lines DO–D7 corresponding to the male contact elements or pins P1–P8 on the second outside connection surface 24 of the connector housing 14 (FIG. 2). The appropriate registers within circuit U1 are selected by the address bus lines A, A1 and A2 (pins P23, P22 and P21), and a write signal ($\overline{WR}$, pin P19) validates the register loadings.

When data characters are transmitted by the outside microprocessor after the foregoing initialization procedure, the circuit U1 performs a parallel-to-serial data conversion. First, the eight-bit parallel data is placed into a transmitter register within circuit U1 which then automatically adds a start bit, followed by the data character bits themselves (least significant first) and the programmed number of stop bits for each character. Also, an even or odd parity bit is inserted prior to the stop bit(s) as defined previously by the system program. The character is then transmitted as a serial data stream on a data output line $S_{out}$ at terminal 11 of the circuit U1. The rate at which the data is shifted out is determined by another previously programmed register within circuit U1. The quartz crystal Q1 coupled to the circuit U1 operates together with a programmable divider within circuit U1 to generate a signal of the appropriate frequency for shifting out the data bits.

The strength or voltage levels of the data bits or signals shifted out from the circuit U1, typically TTL compatible (zero to +5 volts). As mentioned earlier, the RS-232-C Standard requires a stronger signal level so that data can be transmitted over a long cable with the capacity of noise suppression. Accordingly, a line driver circuit U3, e.g., Motorola type MC 1488, is coupled to data output $S_{out}$ and supplementary handshake signals as $\overline{RTS}$ (Request to Send) and $\overline{DTR}$ (Data Terminal Ready) of the circuit U1. When powered by an appropriate power supply, the line driver circuit U3 converts the TTL compatible level (zero to +5 volt) of the serial output from the circuit U1, to a ±12 volt level sufficient to satisfy the RS-232-C Standard. The integral power supply is constructed of a push-pull mode switching scheme, performed by high frequency oscillator derived from U4 (e.g. 4516B RCA), 74C86 exclusive OR gates (U6 e.g. Nat. Semiconductor), high current power transistors within U5 (75951 e.g. Texas Instruments) Tr1 transformer, G1 diode bridge and C2,C3 tantalum capacitors.

When a serial data bit stream is transmitted to the connector 10 from an outside data handling system, specifically to the female contact elements J3 at the first outside connection surface 20 of the housing 14, the

4,603,320

7

higher voltage level of the bit streams is converted to a TTL compatible (0 to 5 volt) logic level by way of buffer-inverters within circuit U2 (e.g., Motorola type MC 1489A). Also, high level complementary signals (J5, J6 and J8 are converted down). The serial data is then shifted into a receiver register within the main logic element circuit U1 where the data is converted into a parallel format; however, the start and stop bits and the parity bit are subtracted. Thus, the data is then ready to be sent to the microprocessor or other outside parallel format data system over the data bus lines DO-D7.

The circuit U1 is selected for operation by the microprocessor or other outside parallel data system connected to the pins P1–P24 of the connector 10 by way of a chip select signal ($\overline{CS}$, pin P18). The receiver register within the circuit U1 is selected by a preset combination of the address bus lines (AO, A1, A2; pins P23, P22, P21), and the parallel data is placed on the data bus lines (DO–D7; pins P1–P8) for transmission to the outside microprocessor. A read signal ($\overline{RD}$, pin P20) activates the data reading from the circuit U1 to the microprocessor. Likewise, status information reading procedure can be performed similarly.

There are several control signals, and control and status registers in circuit U1 that determine the bidirectional serial communication procedure. All the necessary signals, including "handshaking", status and command bits, and modem control are included in communications following the preprogrammed functions from the outside microprocessor software.

Those components on the board 16 (FIG. 2) which have not been discussed above in detail but appear in the circuitry of FIG. 3 will be recognized and understood by those skilled in the art. A preferred quartz crystal Q1 is Seiko type DS-MGQ, 1.8432 MHz, series resonant. The chip capacitors C1–C4 may be Arco type ACT, tantalum, and the chip capacitors C5–C9 may be Murata type GR40 Y5 V. Chip resistors R1–R3 can be panasonic type ERJ-86CSJ, or alternatively can be thick film resistors deposited on the board 16.

The toroid transformer TR1 preferably is made from a Ferroxcube core type 266CT125, material 4C4. The primary winding is $2 \times 10$ turns and the secondary is $2 \times 25$ turns, both bifilar.

FIG. 4 shows a second embodiment of a connector 10′ according to the invention. The outside dimensions and overall appearance of the connector 10′ are generally similar to those of the connector 10 of FIG. 2. Two printed circuit boards or substrates 26′A and 26′B are, however, provided in housing 14′ instead of the single board 26 in FIG. 2. Board 26′A extends at the top of the housing 14′ parallel to the board 26′B which extends across the bottom of housing 14′. Board 26′B carries 24 pins P1′–P24′ on its bottom outside surface 24′ for connection directly to an outside circuit board or into a dual-in-line socket. Board 26′A is coupled by leads L′ to female contact elements J2′–J8′ and J20′ which engage an outside plug connector at connection surface 20′ of the connector 10′.

FIG. 5 shows a third embodiment of a connector 10″ according to the invention. A single, flexible printed circuit board 26″ is contained within the connector housing 14″. Conductors at one end of the board 26″ are directly to the inside of female contact elements J2″–J8″ and J20″ which are arranged to engage an outside plug connector at contact surface 20″. Conductors at an opposite end of the flexible board 26″ are

8

connected directly to the inside ends of insulation displacement type pins P1″–P24″. A cap CP is constructed and arranged to clamp a flat insulated cable (not shown) over pointed ends of pins P1″–P24″ so that the pins pierce through the cable insulation to electrically contact corresponding conductors of the flat cable.

It will be appreciated that the connector of the present invention provides a completely self-contained interface unit which eliminates all the inconveniences of designing and realizing a data interface such as the RS-232-C Standard. Particular components no longer need be selected to meet the requirements of the Standard, voltage level conversions are provided for, and time consuming test procedures and debugging are eliminated. The present connector thus saves engineering effort, development and production time as well as labor costs. Importantly, a considerable space savings is achieved in terminal equipment which would otherwise require means to accommodate a separate interface board.

In order to enable the man skilled in the art to practice this invention in some detail, a complete printed circuit layout is shown in FIG. 6. This layout conforms with the circuitry previously illustrated in schematic form in FIG. 3. The contact areas J2–J8 and J20, which correspond with the respective female contact elements so designated, will be seen in FIG. 6A. Likewise, contact areas P1–P12 (at the near longitudinal edge) and P13–P24 (at the far edge), which correspond with the respective male contact elements bearing the same designation. Capacitors C1–C9, oscillator Q1, and transformer TR1, are seen in phantom outline while resistors R1, R2 and R3 are represented by means of hatch lines. All the other principal elements are shown by means of rectangles suitably labeled. Appropriate wire bonding from the several integrated circuits U1–U6, as well as from the Graetz bridge G1, is shown in FIG. 6A connected to the conductors 30A on the printed circuit board.

It will be noted by the skilled worker that suitably correlated conductors 30B are provided on the lower surface of the printed circuit board 26 (FIG. 6B) so as to make the requisite interconnections among components. The dots 32 represent so-called "vias" between the upper and lower surfaces of board 26.

It will be appreciated that, for the sake of clarity, the depiction of a printed circuit layout for a circuit board 26 to be housed in connector 10 of FIG. 2 is greatly enlarged (approximately 7 times).

While specific embodiments of the invention have been shown and described in detail to illustrate the application of the inventive principles, it will be understood that the invention may be embodied otherwise without departing from such principles.

I claim:

1. An electrical connector for implementing a direct predetermined logical interface between a first data handling system wherein data signals are arranged in a first type of format, and a second data handling system wherein data signals are arranged in a second type of format, comprising:

  a connector housing including a first wall part forming a first outside connection surface and a second wall part forming a second outside connection surface;

  a first set of terminals arranged to extend at least partly through said first wall part from inside said connector housing in a given configuration for

4,603,320

9                                                              10

engaging in electrical contact with corresponding terminals of first outside connection means associated with the first data handling system, with said first set of terminals forming a single logical interface member for matingly engaging a corresponding single logical interface member formed by said corresponding terminals associated with the first data handling system;

a second set of terminal arranged to extend at least partly through said second wall part from inside said connector housing in a given configuration for engaging in electrical contact with corresponding terminals of second outside connection means associated with the second data handling system, with said second set of terminals forming a single logical interface member for matingly engaging a corresponding single logical interface member formed by said corresponding terminals associated with the second data handling system; and

logic interface circuit means arranged within said connector housing and coupled between said first set of terminals and said second set of terminals for converting data signals transmitted to at least some of said first set of terminals from the first data handling system in the first type of format into corresponding data signals in the second type of format and providing said corresponding data signals in the second type of format to at least some of said second set of terminals for subsequent transmission to the second data handling system, and for converting data signals transmitted to at least some of said second set of terminals from the second data handling system in the second type of format into corresponding data signals in the first type of format and providing said corresponding data signals in the first type of format to at least some of said first set of terminals for subsequent transmission to the first data handling system.

2. A connector according to claim 1, wherein said logic interface circuit means comprises means for converting data signals transmitted to at least some of said first set of terminals in a serial format into corresponding data signals in a parallel format and providing the corresponding parallel data signals to at least some of said second set of terminals, and for converting data signals transmitted to at least some of said second set of terminals in a parallel format into corresponding data signals in a serial format and providing the corresponding serial data signals to at least some of said first set of terminals.

3. A connector according to claim 1, wherein said logic interface circuit means comprises means for converting the voltage level of the data signals transmitted to at least some of said first set of terminals from a first voltage level into a second voltage level and providing the corresponding data signals at the second voltage level to at least some of said second set of terminals, and for converting the voltage level of the data signals transmitted to at least some of said second set of terminals from the second voltage level into the first voltage level and providing the corresponding data signals at the first voltage level to at least some of said first set of terminals.

4. A connector according to claim 1, wherein said logic interface circuit means comprises a printed circuit substrate mounted within said connector housing.

5. A connector according to claim 1, wherein said logic interface circuit means comprises an integrated circuit mounted within said connector housing.

6. A connector according to claim 4, comprising an integrated circuit mounted on said printed circuit substrate.

7. A connector according to claim 1, wherein said first set of terminals comprises a number of female contact elements arranged to mate with corresponding male contact elements of the first outside connection means, said first wall part of said connector housing having a number of openings in said first connection surface within which openings said female contact elements are fixedly supported, and said second set of terminals comprises a number of male contact elements arranged to mate with corresponding female contact elements of the second outside connection means, said second wall part of said connector housing having a number of openings in said second connection surface within which openings said male contact elements are fixedly supported.

8. A connector according to claim 7, wherein said first connection surface extends generally within a first plane, and said second connection surface extends generally within a second plane.

9. A connector according to claim 8, wherein said second plane is perpendicular to said first plane.

10. A connector according to claim 8, wherein said second plane is parallel to said first plane.

11. A connector according to claim 8, wherein said male contact elements are arranged in two parallel rows for engaging corresponding openings formed in the female contact elements of the second outside connection means.

12. A connector according to claim 1 wherein said connector housing has structural dimensions of a height of no more than about 0.5 inches (12.70 mm), a depth of no more than about 1.2 inches (30.48 mm), and a width of no more than about 2.0 inches (50.80 mm).

13. A connector according to claim 1 wherein said connector housing comprises walls forming an enclosure member and wherein said logic interface circuit means are completely enclosed within the walls of said connector housing.

14. The connector of claim 1 wherein said first set of terminals comprises a number of male contact elements adapted for direct integrated electrical mating with a printed circuit board member which handles data in said first type of format and wherein said housing is adapted to be physically supported by said printed circuit board.

15. The connector of claim 1 wherein said first set of terminals comprises a number of male contact pins adapted for direct integrated electrical mating with an insulated ribbon cable connector member, with said pins being adapted to pierce the insulation of said cable to electrically contact conductors of said cable whereby said electrical mating is effected said cable connector member being adapted to be electrically connected to a printed circuit board which handles data in a first format and wherein said connector comprises means to physically enclose a portion of said ribbon cable connector.

16. The connector of claim 13 wherein said logic interface circuit means furthr comprises a power supply, with said power supply being contained within said walls of said connector housing.

4,603,320

11

17. A "D-type" 25 pin RS-232-C connector having a male connection interface adapted for direct integrated electrical mating with a printed circuit board member which handles data in a parallel format, said connector further having a female connection interface for mating connection with an external male connection interface member from a device which handles data in a serial format, characterized in that means for converting data from said parallel format to said serial format and means for converting data from said serial format to said parallel format are electrically positioned between said male connection interface and said female connection interface within said connector, and wherein said connector is adapted to be physically supported by said printed circuit board.

18. A method of implementing a logical interface to enable communications between first and second data handling systems wherein data signals are arranged in a first type format in the first system and in a second type of format in the second system, comprising the steps of:

providing a connector housing and supporting first and second sets of electrical contact elements on the connector housing;

exposing the first set of electrical contact elements on one portion of the outside surface of the connector housing and exposing the second set of electrical contact elements on another portion of the outside surface of the connector housing;

arranging the first set of electrical contact elements for connection with the first data handling system outside of the connector housing and arranging the second set of electrical contact elements for connection with the second data handling system outside of the connector housing, wherein each of said first and second set of electrical contact elements comprises a single logical interface member, and wherein said interface members of said first and second set of electrical contact elements are matingly electrically connected to a corresponding single logical interface member of said first and second data handling system respectively;

containing electrical circuitry substantially within the connector housing and connecting the electrical circuitry with the first and second sets of electrical contact elements by arranging conductors inside the connector housing;

converting by way of the electrical circuitry data signals transmitted to at least some of the second set of electrical contact elements in the second type

12

of format from the second data handling system into corresponding data signals in the first type of format; and

providing the corresponding data signals in the first type of format from the electrical circuitry through the conductors inside the connector housing to at least some of the first set of electrical contact elements.

19. The method of claim 18, including arranging one of the first and second sets of electrical contact elements for connection to corresponding terminals on an outside printed circuit board associated with one of the first and the second data handling systems.

20. The method of claim 18, including arranging one of the first and second sets of electrical contact elements for connection to an outside cable connector associated with one of the first and the second data handling systems.

21. The method of claim 18, including arranging a selected one of the first and second sets of electrical contact elements in the form of insulation displacement elements, piercing an insulated cable associated with one of the data handling systems with the displacement elements and electrically contacting the displacement elements with corresponding conductors inside the cable.

22. The method of claim 18, wherein one of said converting steps includes converting serial data into corresponding parallel data, and the other one of said converting steps includes converting parallel data into corresponding serial data.

23. The method of claim 12, including converting by way of the electrical circuitry the voltage level of the data signals transmitted to at least some of the first set of electrical contact elements from a first voltage level into a second voltage level and providing the corresponding data signals at the second voltage level to at least some of the second set of electrical contact elements through the conductors inside the connector housing, and converting by way of the electrical circuitry the voltage level of the data signals transmitted to at least some of the second set of electrical contact elements from the second voltage level into the first voltage level and providing the corresponding data signals at the first voltage level to at least some of the first set of electrical contact elements through the conductors inside the connector housing.

*  *  *  *  *

US004603320C1

(12) **EX PARTE REEXAMINATION CERTIFICATE** (5199th)

# United States Patent

Farago

(10) **Number:**      **US 4,603,320 C1**

(45) **Certificate Issued:**     **Sep. 13, 2005**

(54) **CONNECTOR INTERFACE**

(75) Inventor: **Steven Farago**, Mount Kisco, NY (US)

(73) Assignee: **Acticon Technologies LLC**, Monsey, NY (US)

**Reexamination Request:**
No. 90/006,857, Nov. 10, 2003

**Reexamination Certificate for:**

| | |
|---|---|
| Patent No.: | **4,603,320** |
| Issued: | **Jul. 29, 1986** |
| Appl. No.: | **06/484,823** |
| Filed: | **Apr. 13, 1983** |

(51) **Int. Cl.**[7] ................................................. **H03M 9/00**
(52) **U.S. Cl.** ........................ **341/89**; 341/100; 341/101; 361/685; 439/65
(58) **Field of Search** ................................ 341/100, 101; 439/389, 391, 393, 620, 621, 622

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,327,174 | A | * | 6/1967 | Barre et al. .................. 361/744 |
| 3,395,400 | A | * | 7/1968 | De Witt et al. ............. 341/100 |
| 3,406,368 | A | * | 10/1968 | Curran ......................... 439/79 |
| 3,408,612 | A | * | 10/1968 | Bute et al. .................... 439/68 |
| 3,437,882 | A | * | 4/1969 | Cayzer ........................ 361/791 |
| 3,573,799 | A | * | 4/1971 | Drinnan et al. ............... 341/81 |
| 3,643,135 | A | * | 2/1972 | Devore et al. .............. 361/730 |
| 3,646,573 | A | * | 2/1972 | Holmes, Jr. .............. 178/4.1 R |
| 3,790,858 | A | * | 2/1974 | Brancaleone et al. ...... 174/260 |
| 3,863,226 | A | * | 1/1975 | Ryburn ........................ 710/71 |
| 3,903,404 | A | * | 9/1975 | Beall et al. ................. 361/687 |
| 3,946,379 | A | * | 3/1976 | Lippman .................... 341/100 |
| 3,997,879 | A | * | 12/1976 | Markley et al. ............. 714/24 |
| 4,023,144 | A | * | 5/1977 | Koenig ........................ 710/71 |
| 4,024,505 | A | * | 5/1977 | Sperling ....................... 710/2 |
| 4,031,371 | A | * | 6/1977 | DeVries .................... 361/686 |
| 4,034,346 | A | * | 7/1977 | Hostein ...................... 710/106 |

(Continued)

FOREIGN PATENT DOCUMENTS

| | | | | | |
|---|---|---|---|---|---|
| JP | 56061856 | A | * | 5/1981 | ........... H04L/11/00 |
| JP | 57087255 | A | * | 5/1982 | ........... H04L/11/00 |
| JP | 58047352 | A | * | 3/1983 | ........... H04L/13/00 |

OTHER PUBLICATIONS

Whittaker, "A mass–termination, filtered connector for RS232–C circuits", Thirteenth Annual Connector Symposium Proceeding 1980, pp. 197–204.*

(Continued)

*Primary Examiner*—Howard Williams
(74) *Attorney, Agent, or Firm*—Paul J. Lerner

(57) **ABSTRACT**

A connector interface for enabling communications between first and second data handling systems wherein the data in the first system is arranged in a first type of format and the data in the second system is arranged in a second type of format, includes a connector housing with first and second sets of electrical contact elements exposed at different portions of the housing. Circuitry contained entirely within the housing operates to convert data transmitted to the first set of contact elements from the first data handling system into corresponding data in the second type of format for transmission to the second data handling system through the second set of contact elements, and to convert data transmitted to the second set of contact elements from the second data handling system into corresponding data in the first format for transmission to the first data handling system. One set of electrical contact elements may, for example, be arranged to extend out from the connector housing in two parallel rows to allow the elements to be directly connected to corresponding terminals arranged in a dual in line configuration on an outside printed circuit board. The connector arrangement greatly simplifies the design and construction of data processing systems requiring specific interfaces between certain parts of the systems, such as between data terminal equipment and data communication equipment employing serial binary data interchange.



# US 4,603,320 C1
Page 2

## U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,038,642 | A | * | 7/1977 | Bouknecht et al. ............ 710/20 |
| 4,048,673 | A | * | 9/1977 | Hendrie et al. ............ 710/305 |
| 4,053,950 | A | * | 10/1977 | Bourke et al. ............ 710/22 |
| 4,054,947 | A | * | 10/1977 | Shanks et al. ............ 710/16 |
| 4,065,662 | A | * | 12/1977 | Garczynski et al. ........ 235/419 |
| 4,079,372 | A | * | 3/1978 | Koenig ..................... 341/100 |
| 4,115,849 | A | * | 9/1978 | Johnson et al. ............ 370/464 |
| 4,115,856 | A | * | 9/1978 | Labeye-Voisin et al. .... 710/106 |
| 4,124,888 | A | * | 11/1978 | Washburn ..................... 710/8 |
| 4,124,889 | A | * | 11/1978 | Kaufman et al. ............ 710/2 |
| 4,127,896 | A | * | 11/1978 | Raslavsky, III ............ 703/26 |
| 4,137,559 | A | * | 1/1979 | Reuting ..................... 361/735 |
| 4,150,438 | A | * | 4/1979 | Dorey et al. ............ 710/105 |
| 4,152,750 | A | * | 5/1979 | Bremenour et al. ........ 361/686 |
| 4,206,962 | A | * | 6/1980 | Shue et al. ............ 439/620 |
| 4,217,624 | A | * | 8/1980 | Tuck ..................... 361/686 |
| 4,242,721 | A | * | 12/1980 | Krolak et al. ............ 361/686 |
| 4,245,300 | A | * | 1/1981 | Kaufman et al. ............ 710/1 |
| 4,246,637 | A | * | 1/1981 | Brown et al. ............ 710/62 |
| 4,250,407 | A | * | 2/1981 | Dorey et al. ............ 326/47 |
| 4,250,563 | A | * | 2/1981 | Struger ..................... 710/63 |
| 4,253,143 | A | * | 2/1981 | Onodera et al. ............ 708/104 |
| 4,253,146 | A | * | 2/1981 | Bellamy et al. ............ 709/226 |
| 4,254,462 | A | * | 3/1981 | Raymond et al. ............ 710/63 |
| 4,261,035 | A | * | 4/1981 | Raymond ..................... 709/236 |
| 4,275,455 | A | * | 6/1981 | Bartlett ..................... 700/1 |
| 4,277,646 | A | * | 7/1981 | Sams ..................... 379/93.05 |
| 4,293,924 | A | * | 10/1981 | Struger et al. ............ 710/14 |
| 4,309,754 | A | * | 1/1982 | Dinwiddie, Jr. ............ 710/307 |
| 4,315,308 | A | * | 2/1982 | Jackson ..................... 710/33 |
| 4,328,484 | A | * | 5/1982 | Denecke ..................... 341/64 |
| 4,333,696 | A | * | 6/1982 | O'Neill et al. ............ 439/61 |
| 4,348,636 | A | * | 9/1982 | Doundoulakis ............ 714/46 |
| 4,350,973 | A | * | 9/1982 | Petryk, Jr. ............ 398/202 |
| 4,354,268 | A | * | 10/1982 | Michel et al. ............ 714/724 |
| 4,361,955 | A | * | 12/1982 | Lancaster ..................... 29/884 |
| 4,367,374 | A | * | 1/1983 | Serrano ..................... 379/442 |
| 4,375,103 | A | * | 2/1983 | Arneth et al. ............ 375/358 |
| 4,395,610 | A | * | 7/1983 | Downs et al. ............ 200/292 |
| 4,398,780 | A | * | 8/1983 | Novotny et al. ............ 439/284 |
| 4,401,351 | A | * | 8/1983 | Record ..................... 439/61 |
| 4,403,111 | A | * | 9/1983 | Kelly ..................... 178/69 R |
| 4,404,651 | A | * | 9/1983 | Grudowski ............ 710/19 |
| 4,409,587 | A | * | 10/1983 | Scott ..................... 341/97 |
| 4,426,166 | A | * | 1/1984 | Bowling ..................... 400/62 |
| 4,428,043 | A | * | 1/1984 | Catiller et al. ............ 709/250 |
| 4,428,044 | A | * | 1/1984 | Liron ..................... 714/12 |
| 4,432,604 | A | * | 2/1984 | Schwab ..................... 385/60 |
| 4,434,472 | A | * | 2/1984 | Kachun ..................... 345/565 |
| 4,443,850 | A | * | 4/1984 | Harris ..................... 710/23 |
| 4,443,865 | A | * | 4/1984 | Schultz et al. ............ 712/242 |
| 4,443,884 | A | * | 4/1984 | Swarz ..................... 375/377 |
| 4,445,213 | A | * | 4/1984 | Baugh et al. ............ 370/405 |
| 4,445,215 | A | * | 4/1984 | Svendsen ............ 370/517 |
| 4,447,804 | A | * | 5/1984 | Allen ..................... 341/100 |
| 4,451,884 | A | * | 5/1984 | Heath et al. ............ 710/24 |
| 4,477,862 | A | * | 10/1984 | Gonzales ............ 361/686 |
| 4,480,885 | A | * | 11/1984 | Coppelman ............ 439/159 |
| 4,490,775 | A | * | 12/1984 | Quan ..................... 361/686 |
| 4,493,028 | A | * | 1/1985 | Heath ..................... 710/1 |
| 4,498,716 | A | * | 2/1985 | Ward ..................... 439/55 |
| 4,509,113 | A | * | 4/1985 | Heath ..................... 710/66 |
| 4,514,823 | A | * | 4/1985 | Mendelson et al. ............ 710/2 |
| 4,516,171 | A | * | 5/1985 | Abe et al. ............ 382/245 |
| 4,525,802 | A | * | 7/1985 | Hackamack ............ 361/683 |
| 4,534,011 | A | * | 8/1985 | Andrews et al. ............ 710/58 |
| 4,556,953 | A | * | 12/1985 | Caprio et al. ............ 710/301 |
| 4,571,456 | A | * | 2/1986 | Paulsen et al. ............ 379/457 |
| 4,597,631 | A | * | 7/1986 | Flores ..................... 385/53 |

## OTHER PUBLICATIONS

Hodgetts, "A Shieleded Computer Interface connector", Fourteenth Annual Connector Symposium Proceedings, 1981, pp. 113–118.*

Rowe, "Give your Computeran RS–232C interface", Electornics Australia, vol. 41, No. 9, pp. 81, 83, 84, 139.*

Author Unknown, "Modem Survey", Datamation, vol. 25, No. 3, pp. 167–226.*

Goldman, "Modems–Integral Approach Gains Momentum," Data Communications User, Dec. 1975, p. 31.*

Hewlett–Packard Inc., "Operating Note Model 15104A 15115A 15116A", 1982.*

Magazine of Direct Marketing, Nov. 1982, p. 1291, "The Business Compurter Network Corp has introduced the 'Network Inquirer,' a handheld computer that enables users to access hundreds of public databases by selecting the network desired fro a list . . . ".*

Repko, M., "The Standard Interface", Systems International, vol. 9, No. 6, Jun. 1981, pp. 40–42.*

Polecat, H., "Universal VDU interface," Electronic Product Design, vol. 2 No. 2, Feb. 1981, p. 23.*

Commodore Business Machines, Inc. "VIC–20 The friendly computer VICMODEM," 1982.*

Smith, A.E., "You Can Take It With You," Business Computer Systems, vol. 1, No. 1, Sep. 1981, pp. 94–99.*

Hewlett–Packard HP 82950A Modem Owner's Manual Series 80, Jan. 1982.

Photocopy of a photograph of the circuit board from a HP 82950 modem.

Radio Shack TRS–80 Color Computer Disk System Owner's Manual and Programming Guide, Copyright 1981.

Radio Shack TRS–80 Micro Computer System Expansion Interface Catalog No. 26–1140/1141/1142, Copyright 1979.

Hewlett Packard HP 82938A HP–IL Interface Owner's Manual Series 80, Jan. 1982.

* cited by examiner

US 4,603,320 C1

**1**

**EX PARTE
REEXAMINATION CERTIFICATE
ISSUED UNDER 35 U.S.C. 307**

NO AMENDMENTS HAVE BEEN MADE TO
THE PATENT

**2**

AS A RESULT OF REEXAMINATION, IT HAS BEEN
DETERMINED THAT:

The patentability of claims **1–23** is confirmed.

\*   \*   \*   \*   \*